ANTOINE and FRANÇOIS REMY v. MUNICIPALITY No. TWO et al.

A document intended as a will, but never probated as such, may be good as an acknowledgment of the paternity of natural children.

Acknowledged natural children, after having been put in possession of their father's succession—no legitimate heirs having been shown to exist, or none appearing—may prosecute any claim belonging to the succession.

Plaintiffs sued for certain batture property, alleged to belong to the succession of their father. Defendants averred that the father had surrendered the property to his creditors in 1809. *By the Court:* The surrender no doubt gave his syndic the right to sell, but the title still remained in *Remy.* Old Code, page 294, Art. 17.

This property was never sold. The creditors received very nearly the full amount of their claims. As no creditor asserts any claim against the succession, and as *Remy* died (in 1821) in possession of the property, it is fair to conclude that his creditors were satisfied, if not paid in full.

*Remy* died in the actual possession of the property, which he held under a valid title. There could have been no adverse possession anterior to his death, and, therefore, whatever may have been the character of the alleged possession of defendants, it should have been accompanied by a title translative of property, and exercised in good faith to form the basis of prescription.

Possession, to be the basis of prescription, must be inconsistent with an adverse ownership—must be continuous, unequivocal, uninterrupted, and with the intention of holding as owner, or on behalf of one assuming to be owner. In the absence of such adverse possession, the civil possession of the original owner will be presumed to continue.

Mere possession of battures and banks of rivers for the public use can in no case form the basis of prescription, because such possession is not incompatible with a right of ownership in a riparian proprietor.

The several Acts of the Legislature giving to the city police powers over the batture, were never intended to disturb the rights of property, and had such been the object of the statutes, they would to that extent have been nullities.

APPEAL from the Fifth District Court of New Orleans, *Augustin,* J. *Elmore & King, Durant & Hornor, Lambert* and *Legardeur,* for plaintiffs and appellants.

*Legardeur:*

Presription never accrued in favor of the city, and, therefore, cannot be made the basis of a title against us.

The immediate, nay the sole title set up by defendants is the Act of September 20th, 1820, under which the city claims on two distinct and very dissimilar grounds: first, by prescription of ten, twenty and thirty years, and, secondly, failing in this, by assuming that the Act dedicated the batture in controversy to public use. The latter ground has already been examined at length. Our object is now to show that no prescription has acquired under this Act, and that, from its nature, none could ever, by any lapse of time, acquire.

It is a fundamental principle in the law of prescription that, to enable one to prescribe, he must hold and possess as owner. If he does not claim as absolute owner and master, but admits, or his title discloses, that the property is in another, his title is what is called in the civil law a *titre précaire,* and never by any lapse of time can he acquire the ownership by prescription. Such as is the title in the beginning, so it must continue. Time cannot change its nature, nor is it in the power of the possessor to do so by his own acts. "Neminem sibi causam possessionis mutare posse." Pothier, Traité de Possession, Nos. 31, 32, 33, 34. The following authorities confirm this position:

C. C., Art. 3453. To enable one to plead the prescription treated of in this paragraph, it is necessary that the possession be distinguished by the following incidents:

1st. That the possessor shall have held the thing in fact and right as owner, etc. Code, 1808, p. 482, Art. 38; Code Napoleon, Art. 2229; C. C., 3456, 3404. The same possession (as owner) is required for the prescription of thirty years. C. C., 3466.

Troplong, No. 363 : "Il faut, en sixième lieu, que la possession soit à titre de propriétaire." It is necessary, in the sixth place, that one should possess as owner.

"La prescription est un moyen d'acquérir la propriété : il est donc nécessaire que la possession dont elle émane soit fondée sur l'idée de propriété. Sans cela, la règle : *Tantùm præscriptum quantùm possessum*, mettrait la propriété à l'abri des atteines de la possession même la plus longue. De là ce principe invariable, que, pour prescrire, il faut une possession à titre de maître, *animo domini.*" No. 364.

"Prescription is one of the means by which property is acquired ; it is then necessary that the possession from which it emanates should be based upon ownership, without which the rule *tantùm præscriptum quantùm possessum*, would prevent any title from being acquired, even by the longest possession. Whence, the invariable rule is, that to prescribe, one must possess as owner, *animo domini.*" Nos. 364, 469. Duranton, vol. 21, Nos. 319, 220, 242.

Troplong, No. 365 : "Dans le droit moderne, on appelle possesseurs précaires tous ceux qui jouissent d'une concession même irrévocable qui ne dépouille pas absoluement le propriétaire, et laisse entre ses mains un droit supérieur que le concessionnaire doit respecter."

"In modern law, those are called precarious possessors who enjoy a concession, even irrevocable, which does not absolutely strip the owner, but leaves him entitled to a superior right, which the possessor ought to respect."

Troplong, No. 476 : "Celui qui possède en vertu d'un titre qui lui concède l'usufruit ou l'usage d'une chose, ne peut se prévaloir de sa possession pour convertir son droit à un simple démembrement en droit intégral de propriété : c'est la décision expresse de notre article."

"He who possesses in virtue of a title which confers the usufruct or use of a thing, cannot take advantage of his possession to convert his right to a simple use into a right to the ownership of the thing itself."

Nothing can be stronger evidence than the title itself to determine the nature of the possession." Vazeille, No. 165.

The same possession (as owner) is required for the prescription of thirty years. C. C., 3466 ; Pothier, Nos. 172, 175 ; *Walker* v. *Pratt*, 1 Rob., 41. What constitutes ownership is clearly defined by the Civil Code : "Ownership is the right by which a thing belongs to some one in particular, to the exclusion of other persons." C. C., 480.

"Absolute ownership gives the right to enjoy and dispose of one's own property in the most unlimited manner, provided it is not used in a way prohibited by the laws and ordinances." Art. 483.

Pothier, in his Traité de Propriété, No. 4, says : "Le domaine de propriété est ainsi appelé parce que c'est le droit par lequel une chose m'est propre et m'appartient privativement à tous autres."

Ce droit de propriété, considéré par rapport à ses effets, doit se définir le droit de disposer à son gré d'une chose, sans donner néanmois atteinte au droit d'autrui, ni aux lois. *Jus de re libere disponendi*, ou *jus utendi et abutendi.* "Ownership of property is so called because it is the right by which a thing belongs to me exclusively of all other persons. This right of property, considered in relation to its effects, may be defined to be the right to dispose of a thing according to one's pleasure, provided the right of others are not infringed or the law violated. *Jus de re libere disponendi*, ou *jus utendi et abutendi.* The power to alienate, to use, or to destroy one's property is essential to ownership."

Does the Act of September 20th, 1820, convey to the city a right of ownership in the soil itself, or does it transfer merely a right of possession ? Let the following passages of the Act answer : "The parties of the first part, as well in their personal names as in their capacity of actual possessors of the batture in front of the Faubourg St. Mary, or representing them (the possessors), wishing to favor the public in the use of the banks of the river in front of said batture, and to facilitate the communication of the streets to it, they do by these presents make a donation *inter vivos* and irrevocable to the Mayor, Aldermen, &c., of all the rights which said donors have or may have in relation to it :

1st. In all that portion of the batture or alluvion beginning at the lower line of the property of *William Montgomery*, and extending to the limit between the city and the Faubourg St. Mary, and from the foot of the outside of the new levee to the marginal line of the river at its lowest stage.

REMY
*v.*
2D MUNICIPALITY.

2d. In the new levee which has been constructed along the whole extent of said batture, as well as the soil upon which it is built, &c.

3d. In the soil necessary for the prolongation of the streets of said faubourg to the new levee.

4th. In the soil of Tchoupitoulas street in its whole length along the faubourg.

" It then declares that the present donation is made on the express condition, without which it would not have been made, that all the ground embraced in the donation shall remain inalienable and not subject to seizure for debt or otherwise, in the hands of the corporation of New Orleans, who shall never, under any pretext, sell, exchange, give or otherwise dispose of the same, in whole or in part, in any manner whatever, nor employ it for other public uses than that to which it is naturally destined," &c.

The owners expressly declare that they are the *possessors*, not the *owners* of the batture. No where in the act can an expression be found which intimates in the most remote manner a title in themselves. It is the possession only which they pretend to transfer, and not the ownership. If anything further than the clearest and most positive language were required to manifest this intention, ample evidence might be found in the declaration that the donation is made with a view to accommodate the public in the use of the batture for certain purposes, and in the absolute prohibition against alienating the same by sale, exchange or in any other manner, under any pretext whatsoever. Where language is so clear nothing remains for interpretation.

It is a rule of law in the construction of instruments, " that the intent is to be determined by the words of the instrument where these are clear and explicit and lead to no absurd consequences." (C. C. Art. 1940, No. 3.) That " where the terms are clear and free from all doubt and ambiguity, the letter of it is not to be disregarded under the pretext of preserving its spirit." (C. C. Art. 13.) "It is not allowable to interpret that which has no need of interpretation." Vattel, § 268.

It is to be remarked that defendants have not, in their answer, claimed, any other construction or effect except by simply setting up the plea of prescription; nor have they introduced or attempted to introduce, a particle of evidence to show a different intention. We are, therefore, not permitted to disregard the plain terms of the act, and resort to antecedents not discussed by the record, in order, by a forced construction, to change its nature and effect. By no ingenuity can language be employed which can more effectually exclude all design of conveying the ownership, than that made use of in this act.

Such, then, is the nature of the act, and such the interest transferred. We are now, it must be borne in mind, considering it only in relation to the single question of prescription; and to determine this, it is only necessary to inquire whether defendants possess the ownership or merely the use. The law, as we have seen, peremptorily declares that the party claiming title under prescription *must possess as owner.* Their title proves that they do not possess as owner, but acquired the use only. Under such a possession, no length of time, not even a hundred years, could confer ownership by prescription. The essential element upon which the doctrine is based is wanting. Prescription can no more be acquired without possession as owner, than the human body can exist without life, or a crop of grain be reaped without being sown.

In addition to the authorities before quoted, we will refer the court to a case reported (II Dalloz, 287, No. 15,) where the Parliament of Besançon rejected the pretensions of the Jesuits of Dole to the ownership of a tract of woodland, although they had for more than a century exercised the acts of ownership, because the primitive title of their possession conferred only a right of use. See other cases mentioned by Trop., Nos. 523, 524.

In examining the maxim, *Ad primordium tituli posterior semper formatur eventus,* Merlin says: " This maxim is not difficult to comprehend. When a title is produced, under which possession is held, it is the title which must govern;" "consequently, if this title is affected with a vice of a nature to prevent prescription—that is to say, if it is not translative of property, there can be no doubt that the longest possession can produce no effect." Merlin, V. Pres. sec. 1, § 6, Art. 2.

Pothier, Prescription, No. 172, says; " As to the qualities which the possession ought to have, there is this difference between the prescription of ten and

twenty, and that of thirty years: for the prescription of ten and twenty years, the possessor must produce the just title under which his possession began, and show good faith; for the prescription of thirty years, on the contrary, it is not necessary to produce the title. That the possession proceeded from a just title is presumed from the mere lapse of time, so long as the contrary does not appear.

" The contrary, however, appears if the title from which the thirty years' possession proceeds is produced, and it is found to be one which, in its nature, is not translative of property, and consequently not a just title."

The title not being just and translative of property, and the evidence thereof being proved and perpetuated by the production of the title itself, no prescription can ever run. The presumption of justness of title raised by thirty years' possession is destroyed. Hence the maxim: *Melius est non habere titulum, quàm habere viliosum.* Ibid, Nos. 120, 121, 122, 124; Trop, No. 501.

We, therefore, conclude that nothing more than the possession for certain described uses was transferred to the city; that the primitive title of defendants establishes the fact that the city held only as possessor and not as owner; that such a title being what is called in law *precarious,* can never be the basis of prescription, however long the possession may have continued; whence it necessarily results, that the city had acquired no title by the effect of prescription at the institution of the present suit.

But the defendants will perhaps contend that, admitting the city has not acquired a title by prescription, and admitting, further, that it possesses no title whatever, yet our right of action is extinguished by the prescription of thirty years.

This position is based upon the 3512th Article of the Civil Code: "All actions for immovable property or for an entire estate, as a succession, are prescribed by thirty years, whether the parties be present or absent from the State." Code Napoleon, Art. 2262—the same.

It may be said in argument that the action is nearly identical with the Pétition .d'Hérédité of the French law. It is immaterial with the present case whether it is or not. If accuracy, however, were necessary in this respect, the following distinction might be drawn: The action called Pétition d'Hérédité, derived from the Roman law, was an action brought by one or more heirs to recover the whole or part of a succession, against one in possession *as heir*, or as successor to the *rights* of the apparent heir. It was essential that the possessor should claim succession rights. If he held possession in any other quality than that of heir, or representative of the rights of the heir, the action would be properly an action of revendication, and not a Pétition d'Hérédité. Duranton, vol. 1, No. 557. Rolland de Villargue, verbo Pétition d'Hérédité, § 1, 2, 10, 13. Pothier, Traité du Droit de Propriété, No. 370. It is, however, of no consequence whether this action be considered the one or the other. The rule of prescription is the same with respect to both actions. Rolland de Villargue, § 16; Duranton, vol. I, No. 540. And the only question now under consideration is, whether the action, be it a Pétition d'Hérédité, or one of revendication, is prescribed by the lapse of thirty years. The prescription invoked is founded upon the Article above quoted, copied from Article 2262 of the Code Napoleon. It is to the expounders of the Napoleon Code that we must look for the true meaning and explanation of the language of this Article.

It has never been contended, in the jurisprudence of the country whence this Article is derived, that its provisions are in all cases to be literally understood and applied. The rules of interpretation require that it should be received in subordination to, or at least in connection with, other Articles of the Code, and be so construed that all may harmonize with and give effect to each other. As a general rule, it is true that all actions, both personal and real, are prescribed by a laps of thirty years. To this general rule there is an exception, not an arbitrary exception, but one growing out of the principle upon which the rule laid down in the article is founded. It is, that an action, within the meaning and reason of art. 3512, is never prescribed by the mere lapse of thirty years, unless the party in possession has acquired an *adverse right*. A construction which would give it the effect of destroying the system of prescription of thirty years, by which property is acquired, might be a construction convenient to defendants in the present suit, but certainly not in accordance with reason or just principles. One part of our Code could never have ·been

REMY
v.
2D MUNICIPALITY.

intended by its framers to be so applied or understood as to destroy and render of no effect another, and thus, like two opposing forces of equal power, neutralise each other. This result would unquestionably follow if the article were taken in its literal sense. Our own Code and the French Code say: to acquire a title by the prescription of thirty years, the claimant must possess as owner. If he do not possess as owner, he cannot acquire a title by prescription, no matter what length of time his possession may have continued. Now what is the meaning of this declaration that he *shall acquire no title?* Does it not mean that if the title is not in the possessor by the effect of prescription, it shall remain in the true owner? The title must vest in some person, and in whom should it vest but the real owner? If the title, therefore, being declared not to be in the possessor, still remains in the original proprietor, is there, in the jurisprudence of any civilized country, a rule of law which can take away a right of action on the part of the owner to recover from the possessor what the law positively declares such possessor has no right to? So long as there is a right there is a remedy, is a legal maxim, of universal application. Yet the construction claimed by counsel would virtually defeat the right and render the law of thirty years' prescription in every case a nullity. The law governing this prescription says distinctly: " you have not possessed as owner; your possession has not been continuous and uninterrupted, all of which are essential requisites. Therefore, your possession of thirty years, upon which you rely, can give you no title, no right to the property." The article in question says: if literally considered, although you have no title, still you have a title; because though you have acquired none by prescription, yet you virtually have one from the fact that thirty years having elapsed since the right of action originated, no action can be brought against you by the owner; and being in possession, your title cannot therefore be practically questioned. No matter whether you possessed as owner, or whether your possession had any of the qualities required by law or not, though you had in fact but recently taken possession, if thirty years has elapsed since the true owner might have instituted suit for the property, his right of action being thereby barred, your title is necessarily complete." Here is a direct contradiction. Giving effect to the latter construction, presents the strange anomaly of a right being lost to one without being acquired by another. But the truth is, an action may be brought for immovables so long as the possessor has not acquired an adverse right by prescription. The article 3512 was never intended, and cannot, by a reasonable construction, be made to take away that right, and thus virtually destroy the system of thirty years prescription. The French commentators upon this, as upon all other questions growing out of the provisions embodied in the Civil Code, are full and explicit. They show by the clearest reasoning that an action under this article, is never prescribed by the mere lapse of thirty years, when no adverse right has been acquired. We shall present the reasoning of these authorities: they are so directly in point as to justify being quoted at length. In commenting upon this article, Cotelle, t. 11, p. 449, says: " Mais elle n'exclut la revendication qu'à la faveur de la possession exempte des vices qui empêchent de prescrire, par conséquent de la violence, du précaire et de la clandestinité. Il faut ajouter, pour ce qui regarde la possession de trente ans, que le possesseur n'est point obligé de justifier de l'origine de sa possession, mais elle peut lui être opposée si elle est dans les causes qui s'opposent à la possession, et si le vice n'a point été purgé; car quoique la prescription des biens ne soit que l'exclusion de l'action en revendication, il ne faut pas perdre de vue qu'elle ne peut être fondée que sur la possession; or, si le détenteur n'a pas eu, pendant le temps requis, la possession avec les qualités voulues pour prescrire, la possession n'a pu reposer que sur le maître qui en a été indûment dépouillé de fait, mais qui la retient toujours par l'intention, comme on l'a expliqué."

" But it (the prescription of thirty years) precludes an action of revendication, only with respect to a possession exempt from the vices which prevent prescription such as violence, a titre précaire (that is, not possessing as owner) and a clandestine possession." Hence, when the possession is affected with either of these vices, the action is not precluded by the lapse of thirty years, under art. 2262, upon the principle that no right having been acquired by the possessor, the title remains in the owner.

He then says; " It is necessary to add, in relation to the prescription of thirty years, that the possessor is not compelled to prove the origin of his title;

but it may be opposed to him if it be affected with any of the vices which impair the possesion, and those vices be not removed; for although prescription is nothing more than the taking away an action of revendication, the fact must not be lost sight of that it can only be founded on possession; therefore, if the possessor has not had possession during the time required by law, and it be not clothed with all the requisites indispensable to prescription, the possession can belong only to the owner, who has been unjustly deprived of it, but who always retained it *animo*.

Delvincour, p. 132, quoted by Troplong under No. 469, "Mais, pourra-t-on dire, les actions de dépôt, de commodat, ne sont-elles pas prescriptibles par 30 ans comme les autres actions? Et alors, si le dépositaire ou le commodataire n'acquiert pas directement la propriété par la prescription à l'effet d'acquérir, ne l'acquerront-ils pas du moins indirectement par la prescription à l'effet de se libérer, puisqu'il n'existera plus d'action efficace pour les obliger à restituer?

"Je réponds qu'ils peuvent être effectivement libérés par trente ans, de l'action.personnelle du dépôt ou du commodat; mais qu'ils ne le sont pas de l'action réelle ou en revendication, parce que le vice de leur titre les empêche de pouvoir opposer la prescription à l'effet d'acquérir. Ils sont donc libérés de toutes les prestations personnelles qui ne pourraient être exigées d'eux que par l'action du dépôt ou du commodat. Ils le sont même du prix de la chose, si elle a péri par leur faute. Mais si la chose est entre leurs mains, elle peut être revendiquée par le propriétaire."

"But it may be said: are not actions of deposit and loan prescribed by thirty years, like other actions? And then, if the depositary or the borrower cannot acquire the property directly by the prescription *acquirendi causâ*, do they not acquire it indirectly by the prescription *liberandi causâ*, since the action to compel restriction no longer exists?

"I answer that they may be effectually released by the lapse of thirty years, from the personal action of deposit or of loan; but that they are not released from the real action or action in revendication, because the vice with which the title is affected, prevents them from pleading the prescription by which property is acquired. They are relieved from all personal liabilities which could only be required in actions of deposit and loan. They are even relieved from an action for the price, if it has perished by their fault. But if the thing still remains in their hands, it may be recovered by the owner."

Vazeille, Prescription, vol. 1, p. 445, No. 365. "To loose an existing thing, it is necessary another should have acquired a right to it."

These authorities support the construction for which we contend, that so long as the possessor has not acquired a title by prescription, the action to recover is not prescribed by thirty years. But Duranton, one of the ablest commentators on the French Code, is, if possible, more full in his consideration of this article.

Duranton, vol. 21, No. 243, p. 388, "Mais on ne fait pas attention que quand l'article 2262 dit que les actions réelles, la revendication par conséquent, se prescrivent par trente ans, cet article suppose que la propriété est perdue par ce laps de temps, et que ce n'est que comme conséquence de la perte du droit de propriété, que l'action en revendication est prescrite: or, la propriété n'est perdue pour le propriétaire qu'autant qu'un autre l'a acquise."

"But we do not reflect that when article 2262 says: real action, consequently action of revendication, are prescribed by thirty years, it supposes that the right of property is lost by this lapse of time, and that it is only as a consequence of the loss of the right of property, that the action of revendication is prescribed, since property is lost to the owner only when another has acquired it." See the remainder of the article; also Nos. 244, 245.

Ibid. 343, vol. 21, p. 562, "Toutes les actions, tant réelles que personnelles, se prescrivent bien par trente ans, mais sous les conditions suivantes, qui ont été développées précédemment, et que nous résumons ainsi:

1o. Pourvu que la chose ou le droit soit prescriptible:

2o. Que celui qui invoque la possession à l'effet d'acquérir, ait eu une possession de la qualité et du temps voulus par la loi;

3o. Que la prescription ait pu courir à son profit;

4o. Qu'elle n'ait pas été interrompue;

5o. Et que son cours n'ait pas été suspendu, soit à raison de la qualité du propriétaire ou du créancier, soit pour une autre cause déterminée par la loi."

" All actions, both real and personal, are prescribed by thirty years, but under the following conditions, which have been heretofore developed :

1st. Provided the thing or the right is prescriptible ;

2d. That he who invokes possession as a means of acquiring, should have a possession clothed with all the qualities, and that it should have continued during the time required by law ;

3d. That prescription may run in his favor ;

4th. That it be not interrupted ;

5th. That it be not suspended, either on account of the character of the owner or creditor, or for any other cause prescribed by law."

Ibid., No. 344, p. 562, " En effet, il faut bien remarquer que je ne perds pas mon droit de propriété, et l'action que j'ai pour revendiquer mon immeuble, par le seul laps de trente ans, si aucun autre n'en a joui à titre de propriétaire pendant ce même laps de temps, ou au moins pendant dix ou vingt ans, avec juste titre et de bonne foi, puisque nous retenons la possession *animo tantum.* Il faut, pour que mon droit de propriété soit perdu, et que l'action qui en résulte soit éteinte par l'effet de la prescription, qu'un autre ait lui-même acquis ce droit, et ce n'est généralement que par une possession ou jouissance de trente ans qu'il l'aura acquis.

Ainsi, je néglige pendant quinze ans de prendre possession des biens d'une succession qui m'est dévolue, et que, pour plus de simplicité, j'avais d'ailleurs acceptée ; au bout de ce temps, un tiers, parent du défunt, ou autre, s'empare de cette succession, comme si elle lui appartenait, et les choses restent dans cet état pendant plus de quinze ans encore, mais moins de trente, nul doute, quoiqu'il se soit écoulé plus de trente ans depuis l'ouverture du droit à mon profit, que je ne puisse encore intenter utilement l'action en pétition d'hérédité ; car mon adversaire n'a pas possédé pendant trente ans, et mon action n'était prescriptible par ce laps de temps, que dans la supposition qu'il aurait lui-même acquis le droit par le même temps : la loi n'entend faire éteindre le droit de l'un qu'en raison de ce qu'un autre l'acquiert. S'il en était autrement, une possession de quelques mois, de quelques jours même, pourrait suffire pour opérer l'acquisition de la propriété d'un côté et sa perte de l'autre, et c'est ce qui n'a pu entrer dans la pensée du législateur, puisqu'il exige, pour cette acquisition, une possession d'une durée déterminée. — Nous retenons la possession *animo tantum,* tant qu'un autre ne s'en est pas emparée, et, dans l'espèce, je possédais dès la mort du défunt, parce que, dans notre droit, *le mort saisit le vif ;* ce qui veut non seulement dire que l'héritier recueille le droit, même à son insu, et le transmet à son propre héritier, s'il meurt sans avoir même accepté la succession, mais encore qu'il continue, sans aucune interruption, la possession du défunt. En vain celui qui s'est emparé de cette hérédité, pendant que je négligeais d'en prendre possession, argumenterait-il du principe que l'effet de l'acceptation de la succession remonte à son ouverture pour prétendre que c'est lui qui est censé avoir possédé dès la mort du défunt, et par conséquent qu'il se trouve avoir aujourd'hui une possession plus que trentenaire : cela serait vrai s'il était à l'abri de l'action en pétition d'hérédité par l'effet d'une possession réelle de trente ans, mais son langage n'est qu'un cercle vicieux. Dans la prescription afin d'acquérir, le but direct et principal de la loi n'est pas de punir le propriétaire négligent, c'est de consolider la propriété dans la main de celui qui possède depuis tel ou tel temps ; or, mon adversaire ne possède pas depuis ce temps ; il n'a donc pas prescrit, et par cela même mon action n'est point éteinte, quoique j'aie négligé de prendre les biens de la succession pendant plus de trente ans."

It is to be, indeed, remarked, that I do not lose my right of property, and the action I have to recover my immovable by the mere lapse of thirty years, if no one has enjoyed possession as owner during the whole of that time, or at least during ten and twenty years, with a just title and in good faith, because I retain the possession *animo tantum.* It is necessary, in order that my right of ownership be lost and the action which results from it be extinguished by the effect of prescription, that another should himself have acquired that right, and generally he can only acquire it by a possession of thirty years.

Thus, I neglect for fifteen years to take possession of the effects of a succession devolving upon me, and suppose, for greater simplicity, which I have accepted. At the expiration of this time, a third person, relative of the deceased, or another person, takes possession of this succession as if he were the owner,

and things remain in this state for more than fifteen years, but less than thirty, "no doubt, although more than thirty years have elapsed since the opening of the succession, that I can still maintain my right en pétition d'hérédité, for my adversary has not possessed for thirty years, and my action is prescriptible by that lapse of time only on the supposition that the possessor has himself acquired the right by the same lapse of time. The law does not extinguish my right, except in cases where another has acquired it. If it were otherwise, a possession of a few months or a few days, even, would be sufficient to operate an acquisition of property on one side, and its loss on the other, which never could have been intended by the framer of laws, since it requires for this acquisition a possession for a determinate length of time. One possesses *animo tantùm* so long as another has not acquired, and in this way one's possession has continued since the death of the ancestor, because, in our law, *le mort saisit le vif.*" In the prescription *acquirendi causa*, the direct and principal end of the law is not to punish the negligent proprietor, it is to consolidate the property in the hands of him who has possesed during a certain time. "Since my adversary has not possessed during that length of time, he has, therefore, not prescribed; my right of action is not extinguished, although I have neglected to take possession of the effects of the succession for more than thirty years." See *Gravier et als.* v. *Gravier*, 2 L. R., 458, where the Supreme Court held that the prescription of thirty years does not necessarily extinguish all debts—consequently, that an action may be brought after the lapse of thirty years.

These conclusions of Duranton are received by Troplong in his Treatise of Prescription with approbation, and are embodied in a note to No. 823. All authors, it is true, do not treat the subject so elaborately as Duranton; but it is believed no authority can be found to contradict the doctrine above laid down. It is natural and just, and gives to the article an application which can lead to no absurd results.

It must be observed that the position that our right of action is not prescribed by thirty years, necessarily supposes, what we have demonstrated above, that no title has been acquired by the city by prescription or otherwise, and the question is whether upon this supposition the right of action is, under the Art. 3512, extinguished. The above authorities lay down the rule, that if no title has been acquired by the city, then the action is not extinguished by that article, though more than thirty years have elapsed. So long as no adverse right has accrued, the true owner possesses *animo tantùm*, and may maintain his action at his pleasure.

In the view above taken we have assumed, for the sake of argument, that more than thirty years had elapsed previous to the institution of this suit. Such, however, is not the fact. The city must base its plea, under this article, upon the length of its own possession. It cannot pretend to possess previous to 1846, when the City Council passed the resolution declaring the batture no longer necessary or convenient to the public use, and ordering it to be laid off into lots to effect a public sale. Thirty years, therefore, had not elapsed. With respect to the city, an action can only be deemed to have originated at the period when it took possession of the property sought to be recovered. The question is not when an action might have originated against others, but when it might have been brought against the party in possession. Duranton declares this to be the rule, at the conclusion of No. 244: "Enfin, ce qui tranche la question, c'est que mon action pour les réclamer de mon adversaire n'a pris naissance que du moment qu'il s'en est emparé; or il y a moins de trente ans, donc en prenant l'article 2262 à la lettre, elle est encore bien fondée aujourd'hui puisqu'on ne peut pas dire que j'ai négligé de l'exercer pendant trente ans." Finally, what puts an end to the question is, that my action to recover from my adversary did not originate until the moment he took possession; and as thirty years have not elapsed, even taking the Article 2262 in its literal sense, it is well founded at the present day, since I cannot be said to have neglected to exercise it during thirty years.

With respect to the last ground, that our action did not originate until our adversaries took adverse possession, we refer to the following case in point, reported in the Journal du Palais, 25th May, 1810: *Begon* v. *Héritiers Bonnet*. "*Pierre Bonnet* died 11th December, 1736. *Jeanne Bonnet*, one of his children, renounced his succession by act 28th July, 1748. The other children took no steps in relation to it. The succession, therefore, remained vacant. In 1764 the administrator leased the effects of the succession to pay taxes.

REMY
*v.*
2D MUNICIPALITY.

"Afterwards, *Jeanne Bonnet*, then married to *Sieur Begon*, took possession of the inheritance. After her death, her son, *Peter Begon*, continued her possession without opposition.

"In 1806, the other descendants of *Pierre Bonnet*, the common ancestor, brought suit against *Peter Begon* to recover the succession, on the ground that by virtue of his mother, *Jeanne Bonnet's* renunciation, her share accrued of right to her co-heirs, and that her taking possession was an actual usurpation, which could confer no right, inasmuch as this possession had not continued thirty years. That the prescription of thirty years was not acquired, therefore *Peter Begon*, the heir of *Jeanne Begon*, could not under any pretext relieve himself from the obligation of restoring the whole succession.

"*Peter Begon, Jr.*, answered that an heir who has renounced may always resume the succession, so long as it remains vacant; that the repudiation by an heir always produced one of two effects: either to throw the succession upon the relations of a subsequent degree, if the person repudiating was the only heir, or if he had co-heirs to transmit it to them by accession. That, in the first case the heir may always revoke his renunciation, if relatives of a subsequent degree have not taken possession, and that, in the second case, a renunciation may always be retracted, if the co-heirs have not formally accepted and expressed an intention to profit by it. That in the present case, the children of *Bonnet*, so far from expressing a desire to profit by the renunciation of their sister had constantly abstained from claiming their own hereditary portion. That, under such an hypothesis, *Jeanne Bonnet* could have revoked her renunciation and accepted the succession of their common father, which acceptation would have related back to their ancestor's death, and that seventy years having elapsed since his death, the action of pétition d'hérédité, now instituted by his representatives, was doubly prescribed.

"The decision of the Civil Tribunal of Murat rejected the pretensions of the heirs of *Bonnet* to claim possession of the entire estate, but admitted them at the same time to share concurrently with *Pierre Begon*, their co-heir, without noticing the plea of prescription which the latter had made."

The judgment of the Court of Cassation then proceeds to say: "Considering it to be proved that *Jeanne Bonnet* renounced in 1748 the succession of *Pierre Bonnet*, her father, and that if it were true that they had enjoyed the effects of the succession, they had abandoned them, since the plaintiffs produce a lease of said effects in 1764, for six years, to pay taxes and imposts, which established the fact that a renunciation was made by *Jeanne Bonnet* and her husband; considering further, that *Jeanne Bonnet* and her husband took possession subsequent to the period above determined, but at what precise time is not shown; that notwithstanding her renunciation, *Jeanne Bonnet*, beyond a doubt, became heir by the fact of taking possession before the plaintiffs had determined to accept it; but under these circumstances the defendant, son of *Jeanne Bonnet*, cannot plead prescription against the other co-heirs dating from 1736, the time of *Pierre Bonnet's* death, because the said *Jeanne Bonnet* had renounced her quality of heir, and had only recovered it by taking possession of the estate; whence it follows that prescription did not begin to run until the period of taking possession. The plaintiffs allege that *Jeanne Bonnet* had held possession but nineteen or twenty years anterior to their suit, and this fact not being contested by defendant, it follows that the time which has elapsed is not sufficient to operate prescription."

The plaintiffs might have brought suit for the estate against others, at any time subsequent to 1736, or subsequent to the abandonment by *Jeanne Bonnet*, in 1748; but the court held that the heir in possession could not, in order to support the plea of prescription, avail himself of any lapse of time prior to actual possession, and thirty years not having expired since the commencement of his mother's possession, the action was not prescribed.

This case fully sustains our proposition, that it is only from the date of the possession by the defendants that prescription against our action began to run, if it could run at all, which we most peremptorily deny.

Now, it is too plain for argument that the city had no adverse possession prior to 1846—without which lapse of time, time is never allowed to operate.

No title was conveyed to the city by the act of September 20th, 1820, but on the contrary, the transfer of the title was expressly negatived by the transfer of possession only. As the possession began, so must it continue, until changed

by exercising acts of ownership. No inference can be drawn in favor of owner-ship or adverse possession from the length of its occupation, since this right of occupation or use was conferred by law without infringing upon the rights of the true owner.

Since 1820 the city has been, by law, entitled to the use of all the batture on the outside of New Levee, for the purpose of trade and commerce. This use was absolutely indispensable to the wants of the public. We have before re-ferred to the laws by which its use is regulated, and to the several decisions of our Supreme Court which explain its nature and extent. We have seen that while the ownership of the soil remains in the owner, the use belongs to the public, without prejudice to his title; and so long as the public deem that use necessary, the owner cannot interfere to prevent its enjoyment. No presumption of ownership can be raised in favor of the city by length of possession. The city cannot pretend, nor could the plaintiff, that the use was not necessary down to the year 1846, when the Council, by its resolution, declared it no longer necessary or convenient to the public, and then for the first time assumed a title adverse to that of plaintiff. Not before this period did our right of action ac-crue. We could not have maintained a useful action, because, although our right as owner of the soil was complete, we had not the right of possession, without which an action of ejectment will not lie.

The fact is self-evident and not to be disputed, that the use was absolutely indispensable to the city, until at least within a few years of 1846. It is well known that the batture on the outside of New Levee, in 1820, was but a narrow strip. It then, and for many years after, constituted a portion of the port of the city. It was, strictly speaking, the bank of the river, to the use of which the public had an undoubted right. The immense and constantly increasing com-merce of the city of New Orleans required a space of great width for the land-ing of cotton and sugar, and the produce of the Western country. The accu-mulations of alluvion for many subsequent years was scarcely sufficient to accommodate its growing business. If a line, therefore, could be drawn (which is impossible) between the period when its use was and when it ceased to be indispensable, the difference between that period and 1846 would not be sufficient to give foundation to the plea of lapse of time. But the truth is, its use must be deemed to have been necessary until the city declared the contrary.

The owner could not successfully contest the question of necessity with the city, until that right was given by Act of the Legislature of 1853. See case of *Sarah Ann Withers, Wife of S. M. Kennedy,* v. *The Municipality No. 2 of the City of New Orleans,* decided Jan. 9, 1855.

The Act is as follows, p. 298: "That whenever any riparian owner of pro-perty in the incorporated towns and cities in this State is entitled to the right of accretion, and batture has b-en formed in front of said owner's land more than is necessary for public uses, which the said incorporation withheld from the owner, he shall have the right to institute suit against said incorporation for so much of said batture as may be necessary for the use of commerce and navi-gation, and for the necessary public highways and other public uses; and if it be determined by the court that any portion of said batture be not necessary for' the public uses above mentioned, the court shall decree that said owner is en-titled to said property, and compel said corporation to permit him to enjoy the' use and full ownership of such portion of said batture." The passage of this Act is the most satisfactory evidence of the entire inutility of instituting an action before 1846. It is not for the city, moreover, to dispute that necessity, since it continued to appropriate the whole batture to the uses of commerce' until that period. Its actual use is an admission of the necessity thereof.

From this it results that, even supposing the city had a title competent to' support prescription (which is denied), no prescription could have run against us since 1820, according to the well-known maxim, *Contrà non valentem agere non' currit prescriptio.* Pothier, Prescription, Nos. 22, 23, 24, 697; Troplong, No. 700; *Ayrand* v. *Babin's Heirs,* 7 N. S., 481; *Brown* v. *Jenkins,* 9 M. R., p. 542; 3 L. R, 219; 2 N. S., 422. Whatever legally suspends our right to act must also suspend the effect of lapse of time.

It is, therefore, plain that neither prescription or lapse of time could have run against us prior to 1846, when the adverse possession of the city began.

Under these circumstances it cannot be doubted that we have fully succeeded in showing that our action is not prescribed by Art. 3512, and that this ground of prescription is likewise without the shadow of a foundation.

REMY
*v.*
2D MUNICIPALITY.

But, be this as it may, we maintain that it has not been proved, and does not appear from the record that the defendants ever had corporeal possession of the premises.

Possession is the foundation of prescription. It is a *fact*, not solely a *right*. It must be proved, not presumed. But two kinds of possession are known to the law —natural and civil. Natural, when a man detains a thing corporeal, as by occupying a house or cultivating a piece of ground. Civil, when a person ceases to reside in the house or on the land occupied, but without intending to abandon the possession. (C. C. 3391, 3392; Part. 3, tit. 30, L 2.) It is evident, civil possession is but a mental continuation of a prior corporeal one, and must necessarily be based upon it. The civil can have no existence unless preceded by the corporeal. The intention of the corporeal possessor may be transferred to another by title; that is to say, the person who acquires under a title may unite his civil possession to that of his author's corporeal possession, provided the title be a just one. (C. C. 3394.) He who holds, even under a just title, must show corporeal possession in himself under his title, or in his predecessor or author. A corporeal possession must be proved to have existed in the beginning, otherwise no prescription. For example: A. purchased an immovable from B., and received a title in due form. If he, at the time of purchase, took corporeal possession, he may prescribe against the title of third persons, by ten years' possession, which, after the corporeal, may be continued by the civil possession. But if he failed to take corporeal possession, he must then show such possession in B., from whom he derived his title, or in B.'s predecessor. If he cannot trace an uninterrupted civil possession from himself back to an actual corporeal possession by some one of his predecessors, he cannot acquire by prescription under his title. When the plaintiff has once established an original title in himself, the defendant who pleads a superior title, on the *ground of prescription*, must prove conclusively that his prescription is supported by an original corporeal possession. How strictly this is required by one holding under a title in good faith, will be seen by an examination of the following cases. The Spanish law of prescription is in every essential respect the same with our own, and therefore the jurisprudence of our courts equally illustrate and explain the principles of that law. "When it is necessary to complete a possession already begun, the civil possession suffices, provided it has been preceded by the corporeal or actual possession." *Devall* v. *Choppin et als.*, 15 L. R., 580. "In the prescription of ten and twenty years, under a just title, a corporeal possession must be shown in the beginning; a civil one will then be sufficient to complete the possession already begun. C. C. 3453, 3405; *Wilcoxson* v. *Rogers and Wife*, 13 L. R. 10 and 11; *Ellis* v. *Prevost*, 10 L. R. 251; *Barnes* v. *Gaines*, 5 R. R. 314; *Davis* v. *Dale*, 2 Ann. 205; *Kitridge et als.* v. *Hébert et als.*, 6 Ann. 154; *Green* v. *Hudson*, 7 L. R. 123; *Macarty* v *Foucher*, 12 M. R. 17 and 18. The manner of acquiring possession is clearly defined by the Spanish law. "Two things are necessary to enable a man to acquire possession of an immovable: 1st. The intention to acquire it; 2d. That he takes corporeal possession. If either of these requisites be wanting he cannot acquire possession. Part. 3, L. 6, tit. 30; C. C. 3399.

No evidence of these important and fundamental facts have been adduced by the defendants. The consequence, therefore, is, that their plea of prescription is untenable.

*Roselius* and *Wolfe*, for city of New Orleans.   *R. N. Ogden*, for *Delabigarre*. *R. Hunt*, Curator *ad hoc*, for *Mrs. Livingston*.

LEA, J.  The plaintiffs, alleging that they are the duly acknowledged natural children of *Antoine Remy*, deceased, and as such his sole legal heirs (having been put in possession of his succession as such) claim a portion of land on the batture in front of the former Second Municipality of this city, as forming a part of said succession.

This property they claim as belonging to said succession by a regular chain of titles derived originally from *John Gravier* in 1800, and transmitted by successive sales to their ancestor, who died possessed of the same.

Wherefore they claim that the Municipality No. Two, *Miss Amaryllis L. Delabigarre*, *Mrs. Livingston* and *Mrs. Barton*, who, the petitioners allege, set up

some title or claim to said lot of ground, be cited, and that, after due proceed-    <span>Remy<br>v.<br>2d Municipality.</span>
ings had, the said petitioners be recognized as the owners of the lot by them
claimed.

The answer of the city denies specially the heirship of the petitioners, sets
up an act of compromise, entered into in 1820 between the city of New Or-
leans, *Edward Livingston*, and the riparian proprietors fronting on the batture
at that time, as a basis of title, or at least as conferring such title upon the
public, of whose interests and rights the city authorities are the administrators,
as to form a basis of prescription, which they plead in bar of the plaintiffs'
right to recover.

*Miss A. L. Delabigarre*, for answer, also denies the heirship of the plaintiffs,
and pleads the prescription of thirty years.

*Mrs. Livingston* and *Mrs. Barton* also deny the heirship of the plaintiffs, but
aver that their title has been transferred to the Municipality No. Two of New
Orleans by two several acts of donation and compromise, the one passed in
1820, and the other in 1851.

The pleadings present, therefore, three questions for solution:

1st. Are the petitioners the legal heirs of the deceased *Antoine Remy?*

2d. Did the property in question belong to *Antoine Remy* at the time of his
decease?

3d. If the two foregoing questions are answered in the affirmative—have the
defendants, or any of them, acquired, as against the plaintiffs, an adverse title
by prescription?

It appears from the evidence that the petitioners were duly acknowledged
as the natural children of *Antoine Remy, sen.,* (whose succession they claim)
by an act passed before a notary and two witnesses, on the 7th March, 1808.
This document, it is true, was intended to be a will, and has never been ad-
mitted to probate as such, but though not binding as a will, it is certainly good
as an acknowledgment of paternity made in due form of law. It is moreover
shown that the petitioners had the name, the reputation, and status of the re-
cognized illegitimate children of *Antoine Remy ;* as such they were, after a full
compliance with all the formalities required by law, put in possession of the
succession of their deceased father. If any legitimate relations of *Antoine
Remy* existed at the time of his decease, (which nothing in the evidence estab-
lishes) they have allowed a period of thirty-four years to elapse without pre-
senting any claim to his succession.

The petitioners were, therefore, properly put in possession of the succession
of their natural father. It is not necessary to enquire whether, if a legitimate
heir were to present himself as a claimant of the succession, he would or would
not be barred by the provisions of Article 1023 of the Civil Code. It is suffi-
cient that in point of fact no such heirs are shown to exist, or if in existence,
they have not presented any claim to the succession.

We think, therefore, that the petitioners have the right to stand before the
court as the acknowledged representatives of their deceased father, and as such
to prosecute any claims belonging to his succession.

When *Remy, sen.,* died, he was undoubtedly in possession of the property
claimed by his representatives under a chain of titles dating back as far as the
year 1800. The titles from *Gravier* to *Theard*, and from *Theard* to *Remy* and
*Ellingham* conveyed title to the river. By an act of partition between *Remy*
and *Ellingham*, the entire ownership became vested in *Remy*, who afterwards,

by act passed in January, 1810, transferred all that portion of the lot lying in the rear of the levee to *Tabary*. The batture portion of it continued in his actual use and possession till he died, and did not pass to *Tabary* by the act of sale.

Now, if *Remy* was in possession under a good valid title, dating back to the year 1800, his heirs must certainly recover it, unless it can be shown that he, or his heirs, had been divested of the title. It is urged, on behalf of the city, that *Remy* divested himself of his title by a surrender of his property to his creditors; and lastly, that by an act of donation and compromise, passed between the Mayor, Aldermen and inhabitants of New Orleans and *Edward Livingston*, and other riparian proprietors, before *H. Lavergne*, Notary Public, on or about the 20th September, 1820, for the purpose of settling the conflicting claims to the alluvion, the piece of ground claimed by the plaintiffs, which was then in existence, together with all its future increase, was donated and abandoned to the said Mayor, etc., for the sole and exclusive occupation and benefit of the public: that the said parcel of ground thereby became a public place (*locus publicus*), and all that has been added thereto has become a public place; that the piece of ground in question has been in the undisturbed possession and occupancy of the public for upwards of thirty-one years, by which possession the right of the public to the said piece of ground has been acquired, ratified and confirmed, even if the title of the public had been considered doubtful without said possession and occupancy, which alleged public possession and occupancy is made the basis of the plea of prescription.

As respects the surrender of the property by *Remy* to his creditors, it no doubt gave his syndic a right to sell the same for their benefit, but the title still remained in *Remy*. Old Code, page 294, Art. 17.

It is clear that this property was never sold, and an examination of the imperfect record of the insolvent proceedings show that the creditors received from the proceeds of the sale of other assets very nearly the full amount of their claims. As no creditor of the deceased asserts any claim against his succession, and as *Remy* died in the actual possession of the property, it is a fair and reasonable conclusion that his creditors were satisfied, if not paid in full.

It is to be remarked that the surrender was made in 1809, and that *Remy* died in 1821.

If the foregoing views are correct, the only question to be determined is whether an adverse title has been acquired by prescription.

As we think it is satisfactorily proved that *Remy* died in the actual possession of the property, which he held under a valid title, there could be no adverse possession prior to that period, and therefore, whatever may have been the character of the alleged possession of the city, it must have been accompanied by a title translative of property, and exercised in good faith, to form the basis of prescription.

Now, even assuming the questionable propositions that the act of donation or compromise of 1820, under which the city claims title, was intended to be, and was in reality, a title translative of property from the donors to the public, and that the city authorities, as the administrators of this property for the use of the public, have the right to invoke on their behalf the plea of prescription; it is clear that the possession which is made the basis of prescription, must be of a character which is inconsistent with an adverse ownership. As against a person having a good and valid title to property, accompanied by an actual

possession under it (for however short a period of time) no one can acquire a <span style="float:right">REMY<br>*v.*<br>2D MUNICIPALITY.</span> right by prescription except by such an actual adverse possession as that above designated, which possession must be continuous, unequivocal, uninter·rupted, and with the intention of holding as owner, or on behalf of one assuming to be the owner. In the absence of such adverse possession, the civil possession of the original owner will be presumed to continue. Now, we consider it well settled that, under the laws of this State regulating the public use of battures and banks of rivers, mere possession for the public use can in no case form a basis of prescription, because such possession is not incompatible with a right of ownership in a riparian proprietor. See 18 L. R., 236; also *S. A. Withers* v. *Municipality No. Two*, 10 An. "The possession of the city is purely administrative, destined in its nature to terminate upon the happening of a certain contingency, (which, in the case at bar, has already happened.) It cannot, therefore, be pleaded against the riparian proprietor as the basis of an adverse title in the city." See *Withers* v. *City of New Orleans*, 10 An.

In order, therefore, to support the plea of prescription based upon an adverse possession, we must look for such distinctive acts of possession as are inconsistent with ownership in another, and ownership is defined by the Code to be " the right by which a thing belongs to some one in particular to *the exclusion of other persons*." C. C. 480. The evidence, in our opinion, fails to establish any act of possession or ownership exercised by the city authorities which was inconsistent with a title in the plaintiffs, or with which the plaintiffs, as owners, could have interfered, under existing laws, prior to the year 1846, when the Council for the first time assumed a title adverse to that of the plaintiffs, by offering for sale batture lots, or passing resolutions to the effect that portions of the batture be sold for the exclusive benefit of the Municipality.

This act of ownership was within ten years prior to the institution of this suit, and cannot be relied upon as forming a basis of prescription.

We have seen, then, that the plaintiffs claim under a good and valid title, paramount to all others, accompanied by an actual physical possession, which continued until the 24th June, 1821, and a civil possession extending to a much later period, which was never interrupted by any act on the part of the city authorities inconsistent with that ownership until the year 1846. The several acts of the Legislature, giving to the city police powers over the batture, were intended to enable them the better to enforce their administrative authority on behalf of the public, who were entitled to the *use of the batture* for the purposes of commerce; they were never intended to change or disturb the rights of property, and had such been the intent and object of these statutes, they would to that effect have been nullities. The civil possession of the representatives of *Remy* was not disturbed by the exercise of the police and administrative powers of the city authorities over the property in question, as they still possessed it in the only manner in which any owner could possess property similarly situated.

We have been referred to the fact, as disclosed by the evidence, that *Remy, sen.*, intervened in the suit brought by *John Gravier* against the city of New Orleans, and it is urged in argument that the plaintiffs are bound by the judgment recognizing *Gravier's* title. The plea of *res adjudicata* is not set forth in the pleading, but if it had been, it is evident that no issue was made up on the demand in intervention, and that the judgment ignores it altogether. More-

21

REMY
*v.*
2D MUNICIPALITY.

over it appears to have been discontinued before trial and judgment on the merits.

The claim of *Miss A. L. Delabigarre* is founded upon a bill of sale from *Gravier* subsequent in date to that made to the plaintiffs, and so far as the evidence discloses does not appear to have been accompanied by any act of possession whatever, so far as relates to the particular property in dispute.

As *Mrs. Livingston* and *Mrs. Barton* have disclaimed title to the property claimed by the petitioner, there can be no objection to a judgment in favor of the plaintiff, so far as they are concerned. .

It is ordered, that the judgment appealed from be reversed, and that the plaintiffs be recognized as the true and lawful owners of the property claimed by them, to wit: that portion of the batture lying and being in front of the lot described in the petition, to wit: a lot of ground situated in the fauburg St. Mary, being numbered 64, and having sixty feet front on the river, and one hundred and sixty feet in depth, the whole as more fully described in the act of sale annexed to the petition.

It is further ordered, that the defendants pay costs in both courts.

A rehearing was applied for in this case, and thereupon the following order was entered up:

LEA, J.   In this case a rehearing is granted exclusively for the purpose of considering the propriety of amending the judgment so as to reserve the rights of the city of New Orleans, and of the public, to the use of such portion of the batture, which is the subject matter of litigation herein, as may be necessary for the purposes of commerce, or other public uses.

After the rehearing the following decree was rendered:

LEA, J.   In this case, the court having duly considered the arguments of counsel on the rehearing granted herein, it is ordered that the judgment heretofore rendered herein be so amended as to read as follows:

It is ordered, that the judgment appealed from be reversed, and that the plaintiffs, *Antoine* and *François Remy* be recognized as the true and lawful owners of the property claimed by them, to wit: that portion of the batture · lying and being in front of the lot described in the petition, to wit: a lot of ground situated in the fauburg St. Mary, being numbered 64, and having 60 feet front on the river and 160 feet in depth, the whole as more fully described in the act of sale annexed to the petition, reserving to the city of New Orleans the possession for the purposes of administration of such portion of the property in dispute as may be subject.to the servitudes established by existing laws on land fronting on the Mississippi river, within the limits of the city of New Orleans.

It is further ordered, that the defendants pay costs in both courts.